FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: June 16, 2021

JAMES N. HATTEN, Clerk

By: s/Angela Smith
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL INFORMATION |
| v. | No. 1:21-CR-226 |
| BRETT SABADO | |

THE UNITED STATES ATTORNEY CHARGES THAT:

## COUNT ONE
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

1.    Beginning on a date unknown to the United States Attorney, but at least by in or about June 2014, and continuing until at least in or about May 2020, in the Northern District of Georgia, and elsewhere, defendant BRETT SABADO, aided and abetted by others known an unknown, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with co-conspirators and others known an unknown to the United States Attorney, to execute and attempt to execute a scheme and artifice to defraud TRICARE and Medicare, which are health care benefit programs affecting interstate commerce, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by omission of material facts, money and property owned by, and under the custody and control of TRICARE and Medicare, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

## Background

At all times relevant to this Information, unless otherwise stated:

## Defendant and Related Companies

2.     Defendant BRETT SABADO was a resident of Draper, Utah; Carlsbad, California; and Fulton County, Georgia.

3.     Choice Medical Products, Inc. ("Choice Medical") was a medical supply company, located in Orlando, Florida, that purported to provide durable medical equipment ("DME") to Medicare beneficiaries, among others.

4.     EZ Life Medical Supply ("EZ Life") was a medical supply company, located in Tarzana, California, that purported to provide DME to Medicare beneficiaries, among others.

5.     NHS Pharma, Inc. and NHS Pharma Sales, Inc. (collectively "NHS") were California companies with principal places of business located in Redlands, California.  Defendant BRETT SABADO was NHS's General Manager.

6.     PRV Medical Supply, Inc. ("PRV") was a medical supply company located in Escondido, California, that purported to provide durable medical equipment to Medicare beneficiaries, among others.

7.     Red Rock Operations, LLC ("Red Rock") was a medical supply shipping company co-owned and operated by defendant BRETT SABADO. Red Rock was located in American Fork, Utah and later relocated to Atlanta, Georgia where it

continued to provide shipping services for medical supply companies, among others.

8.    Square One, LLC ("Square One") was a billing company co-owned and operated by defendant BRETT SABADO.  Square One was initially located in Utah and later relocated to Atlanta, Georgia and provided billing services for medical supply companies.

9.    Zee & Associates, LLC ("Zee & Associates ") was a medical supply company located in Costa Mesa, California, that purported to provide DME to Medicare beneficiaries, among others.

### The TRICARE Program

10.    TRICARE was a federally-funded health care program providing medical insurance benefits to military personnel, retirees, their families, and survivors. TRICARE was as a health care benefit program under Title 18, United States Code, Section 24(b). Persons covered by TRICARE were referred to as "TRICARE beneficiaries."

11.    TRICARE provided prescription drug coverage (including for certain compounded drugs).  Compounding was a practice in which a licensed pharmacist combined, mixed, or altered ingredients of a drug in response to a prescription to create medication tailored to the needs of an individual patient.

12.    Express Scripts, Inc. was a Pharmacy Benefit Manager that processed prescription drug claims on behalf of TRICARE. TRICARE and Express Scripts processed and paid prescription drug claims in good faith reliance on the fact

that the drugs were dispensed pursuant to valid prescriptions. In other words, TRICARE and Express Scripts would not have paid for prescription drugs had they known drugs had not been issued pursuant to valid prescriptions. Valid prescriptions were those signed by licensed medical professionals after examining patients and determining that the drugs prescribed were medically necessary to treat their illness or condition.

13.   TRICARE and Express Scripts also processed and paid prescription drug claims in good faith reliance on the fact that kickbacks had not been offered, paid, solicited, or received in the course of generating the prescriptions. Had they known any kickbacks were involved, TRICARE and Express Scripts would have refused payment.

### The Medicare Program

14.   The Medicare Program ("Medicare") was a federally-funded health care program providing medical insurance benefits to persons 65 years of age or older, or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b). Persons covered by Medicare were referred to as "Medicare beneficiaries."

15.   Physicians, companies, and other health care providers that provided items and services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to abide by the policies, procedures,

rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Social Security Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Providers were given and provided with online access to Medicare manuals and service bulletins describing proper billing procedures, rules, and regulations.

16.   Medicare regulations required providers to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician. Medicare required complete and accurate patient medical records so that Medicare could verify that the services were provided as described in the claim form. These records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the health care provider.

17.   Medicare paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, documented, and actually provided as represented to Medicare. Medicare would not pay for items or services that were procured through kickbacks and bribes.

18.    Durable medical equipment includes mechanical aids designed to assist an individual suffering from physical limitations, such as wheelchairs, walkers, and canes, and orthotics such as back braces and knee braces. DME was a covered benefit under the Medicare program.

19.    Medicare would not reimburse claims for DME if a beneficiary received the same or similar equipment within five years, unless Medicare determines that a certain item does not have a reasonable useful lifetime of five years.

## Telemedicine

20.    Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or the telephone, to interact with a patient.

21.    Telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers.

22.    Medicare Part B covered expenses for specified telehealth services if certain requirements were met. These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth consultation with a remote practitioner.

## Object of the Conspiracy

23.   It was the object of the conspiracy for defendant BRETT SABADO and his co-conspirators to unlawfully enrich themselves by, among other things, (a) submitting and causing the submission of false and fraudulent claims to TRICARE and Medicare for items and services that were ordered or provided through illegal kickbacks and bribes, medically unnecessary,  and ineligible for reimbursement; (b) concealing the submission of false and fraudulent claims to Medicare; and (c) diverting proceeds of the fraud for the personal use and benefit of defendant BRETT SABADO and his co-conspirators.

## Manner and Means of the Conspiracy

24.   Defendant BRETT SABADO and his co-conspirators employed the following means and methods, among others, to effectuate the conspiracy charged herein:

     a.   In or about June 2014, defendant BRETT SABADO became the General Manager of NHS.

     b.   It was further part of the conspiracy that defendant BRETT SABADO and his co-conspirators referred the compounded medication prescriptions belonging to TRICARE beneficiaries to pharmacies in exchange for illegal kickbacks.

     c.   It was further part of the conspiracy that defendant BRETT SABADO created for NHS an online portal database used by "marketers" to facilitate the referral of compounded medication

prescriptions for TRICARE beneficiaries in exchange for illegal kickbacks.

d.  It was further part of the conspiracy that defendant BRETT SABADO prepared and delivered NHS invoices to pharmacies in order to facilitate the payment of kickbacks to NHS by the pharmacies.

e.  It was further part of the conspiracy that defendant BRETT SABADO and his co-conspirators paid kickbacks to "marketers" for DME prescriptions belonging to Medicare beneficiaries.

f.  It was further part of the conspiracy that defendant BRETT SABADO started Red Rock to be used as a drop-shipping company for Choice Medical, EZ Life, PRV, and Zee & Associates (collectively, the "DME Companies"), and later relocated Red Rock to Atlanta, Georgia to continue the drop-shipping services for those businesses.

g.  It was further part of the conspiracy that defendant BRETT SABADO, through Red Rock, packed and shipped DME on behalf of the DME Companies, regardless of medical necessity, in the absence of a pre-existing doctor-patient relationship, without a physical examination, and frequently based solely on a short telephonic conversation with the beneficiary.

h.  It was further part of the conspiracy that defendant BRETT SABADO started Square One to provide billing services to the DME

Companies, and later relocated Square One to Atlanta, Georgia to continue servicing for those businesses.

i. It was further part of the conspiracy that defendant BRETT SABADO, through Square One, verified Medicare beneficiaries' eligibility to receive DME and provided to his co-conspirators the verification information, which was used to determine if false and fraudulent claims for certain Medicare beneficiaries would be reimbursed by Medicare.

j. It was further part of the conspiracy that defendant BRETT SABADO was paid by his co-conspirators for shipping medically unnecessary DME and verifying Medicare beneficiaries' eligibility from funds obtained through Medicare reimbursements.

k. It was further part of the conspiracy that defendant BRETT SABADO and his co-conspirators caused the submission of false and fraudulent claims to the TRICARE program for items that were procured through illegal kickbacks and bribes, medically unnecessary, and ineligible for Medical reimbursement, which were paid in the amount of $4.5 million dollars.

l. It was further part of the conspiracy that defendant BRETT SABADO's co-conspirators submitted and caused the submission of false and fraudulent claims to Medicare for items and services that were procured through kickbacks and bribes, medically

unnecessary, and ineligible for Medical reimbursement, which were paid in the amount of at least $69 million dollars.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE PROVISION

Upon conviction of the offense alleged in Count One of this Information, defendant BRETT SABADO shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 18, United States Code, Section 982(a)(7), and Title 28, United States Code, Section 2641(c), all property that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the violation, including, but not limited to, a money judgment equal to the amount of proceeds obtained as a result of the offense.

If, as a result of any act or omission of the defendant, any property subject to forfeiture:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

the United States intends, pursuant to Title 18, United States Code, Section 982(b), Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant

up to the value of the forfeitable property.

KURT R. ERSKINE
  *Acting United States Attorney*

*Bernita Malloy*
BERNITA B. MALLOY
  *Assistant United States Attorney*
Georgia Bar No. 718905

*Angela Adams*

ANGELA ADAMS
  *Assistant United States Attorney*
Georgia Bar No. 613114

600 U.S. Courthouse
75 Ted Turner Dr., S.W.
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181